| 29 | 443 |
| 113 | 429 |

WALTON ECTOR, transferree of GEO. D. SHARP, plaintiff in error, vs. JOSEPH L. WELSH, defendant in fi. fa., and WILEY B. ECTOR, guardian, &c., claimant, defendant in error.

[1.] Under our statute of 1854, (see *Acts of* 1853–54, *p.* 49,) confining objections in trials in the last resort, against depositions taken under commission, after the case has been submitted to the jury, to those which are based upon irrelevancy, no objection on account of the evidence being hearsay will be entertained.  STEPHENS dissenting.

[2.] The single fact that a donor retains the possession of the property given, is sufficiently explained by showing that he is the parent, or stands *in loco parentis* to the donee, who is a minor and resides with him.

[3.] The admissions of parties are not to be regarded as an inferior kind of evidence, but the testimony which proves that admissions were made, and the terms in which they were made, should be scanned with caution.

Claim, in Meriwether Superior Court.   Tried before Judge BULL, at February Term, 1859.

This was a claim interposed by Wiley B. Ector, guardian of Elizabeth Victoria Johnson, to certain negroes, levied on as the property of Joseph L. Welsh, by virtue of an execu-

tion in favor of George D. Sharp, against said Welsh, and transferred to Walton B. Ector.

The jury found for the claimant, and plaintiff in *fi. fa.* moved for a new trial on the following grounds:

1st. Because the Court erred in admitting in evidence the answer of George D. Sharp to the last direct interrogatory, which answer was as follows: " All I know about this question is, that Joseph Duncan told me that they wanted this execution for Ector, so that they could cover the property levied on, and keep it from being sold for Welsh's debts hereafter."

The objection to the reading of this answer was taken after the case had been submitted to the jury.

2d. Because the Court erred in refusing to admit that part of the answer of Joseph Duncan, to the second interrogatory, as follows: " Witness heard Mr. George D. Sharp say, in witness's store in the town of Greenville, that he had sold the White Sulphur Springs, and the lands thereto attached, to Joseph L. Welsh, defendant in execution, for $8,500; and also heard Mr. Welsh and his wife both say that they had purchased said premises, and that the aforesaid sum of money was the consideration for the same, for which, witness thinks, Welsh said he had given his notes, and took Sharp's bond for titles—all of which took place a few days after the trade, which was in the year 1838 or 1839, as well as witness now remembers."

The objection to this answer was taken after the case had been submitted to the jury; the objection was sustained, and the answer excluded on the ground of irrelevancy.

3d. Because the Court erred in charging the jury, that if Welsh never reduced the property to possession as his own, by virtue of his marital rights, and died before his wife, it was not subject to his debts. And further, that although possession by the donor, after an absolute conveyance, was a badge of fraud which might be explained, and unless explained became conclusive, yet if the defendant in *fi. fa.*

(Welsh) took and held the possession of the property conveyed, the donee being a minor, this was a sufficient explanation of his possession, provided the transaction was otherwise fair.

4th. Because the Court erred in charging, that "the testimony of a witness purporting to give the statements, saying, and declarations of parties, was an inferior kind of evidence, yet it should be considered by the jury, and taking into consideration the situation of the witness and his opportunities of knowing and hearing what he testifies to, they might give it such weight as they thought proper."

5th. Because the verdict was contrary to law and the evidence.

The following is the deed of gift above referred to in the charge of the Court below, and commented on in the opinion pronounced by this Court:

"GEORGIA, MERIWETHER COUNTY.

Know all men by these presents, that we Joseph L. Welsh and Dolly Welsh his wife, for and in consideration of the natural love and affection which we respectively have for and towards Elizabeth Victoria Johnson, (child and daughter of the said Dolly Welsh by her former husband, Doctor Benjamin Johnson,) do by these presents give, grant, alien, convey, assign and relinquish unto her, the said Elizabeth Victoria Johnson, all and singular the rights and interest which we or either of us now have or may hereafter acquire, either in law or equity, to all and singular that part or portion of the late Hugh W. Ector's estate to which she the said Dolly Welsh, formerly Dolly Ector, is or may be entitled to as one of the distributees of said Hugh W. Ector's estate and all and singular such interest as the said Joseph L. Welsh may have acquired in the said Ector's estate, by virtue of his intermarriage with the said Dolly—to have and to hold the same unto her, the said Elizabeth Victoria Johnson, and her heirs forever in fee simple, free and discharged from all claim or claims which we or either of us have to the

aforesaid property real or personal. In testimony whereof, we have hereunto set our hands and seals, this the 8th January, 1841.

JOSEPH L. WELSH, [L. S.]
DOLLY WELSH. [L. S.]

Signed, sealed and delivered in the presence of

A. F. BRANNON,
A. H. BELYUE,
GEO. W. TURRENTINE, *J. P.*

The Court overruled the motion for a new trial, and counsel for plaintiff excepted and assigned said refusal as error.

DOUGHERTY; and ADAMS & KNIGHT, for plaintiff in error.

B. H. HILL, *contra.*

*By the Court.*—STEPHENS J. delivering the opinion.

[1.] We are all agreed that there ought to be a new trial in this case, but we differ as to the ground on which it ought to be placed. A majority of the Court place it upon the rejection of Duncan's answer (to written interrogatories) respecting the *sayings* of Sharp and of Mr. and Mrs. Welsh; the objection to the testimony having been taken only after the case had been submitted to the jury. My own opinion is, that this evidence ought to have been excluded, but that the testimony of Sharp, (also written depositions) respecting the *sayings* of Duncan, was illegally admitted. We all agree that both pieces of evidence are in the same predicament— are simple hearsay. My colleagues think both pieces ought to have been admitted, and the error they find is that one was rejected. I think both ought to have been excluded, and the error I find is that one was admitted. They are both confessedly inadmissible, unless they were required to be admitted by our statute of 1854. See the *Acts of* 1853–54, *page* 49. The title of that Act, so far as the title relates to

this question, is " to *regulate* the admission of testimony in certain cases." The title, therefore, leads me to expect no *creation* of evidence, but only a regulation of the admission of what was evidence before. The words of the Act are : " That (on all appeal ?) trials or other trials in the last resort, all exceptions to interrogatories, the execution of commissions, [commissioners,] or answer of witnesses examined under commission, when the commission has been duly returned and the same ordered or consented to be opened, and been for one day subject to inspection, shall be taken and determined before the case is submitted to the jury, otherwise the testimony shall be received, subject only to the objections that may be made for *irrelevancy*." The old law was, that the whole deposition of a witness could be ruled out whenever offered, for want of conformity with any statutory requirement in relation to testimony taken under commission. The mischief was, that a party was sometimes obliged to proceed with his case (having submitted it to the jury) with the loss of valuable legal evidence, which could manifestly be saved by a *re-execution* of the commission. The remedy is to require all exceptions founded on *curable* defects, to be *determined before the case is submitted to the jury*, so that the party, if the exceptions are well grounded, may continue the case when it is called, and have an opportunity to *cure* the defects in his evidence. The whole provision of the statute relates, in my view of it, to only such exceptions as are *curable*. They are to be determined before the case is submitted to the jury for no possible good reason except that they may be cured if they *can* be cured, by a re-execution of the commission. Why give time to cure what is incapable of being cured ? The object is to give time for procuring evidence which cannot *now* be received. But why give time to procure evidence which *never will be* received if objection is made to it ? Can it be supposed that written depositions, with all the abuses and defects inseparably inherent in this sort of testimony, was ever intended to be placed on a more

favorable ground than the statements of the witness from the stand? Yet this consequence follows, if his written report of hearsay or gossip must be received, when his oral statement of the same thing would be rejected. Again, can it be supposed that it was intended to introduce so radical a change into the law of evidence, as to allow mere *gossip*—" an old wife's story"—without a known author, and dependent for its passage on down to the witness, upon untold rehearsals, to be forced on the consideration of a jury against the objection and protestation of the opposite party? Was it *intended* that the jury should consider evidence coming without the sanction of an oath or any other of the legal sanctions importing verity? And especially, was it intended to introduce this radical change, not from any conviction of its propriety as a rule of evidence, but as a mere compliment to that vehicle of evidence, which is confessedly the most defective and the least to be favored? But my colleagues say, in answer to all this, that they are constrained by the letter of the statute, which says the "testimony shall be subject *only* to objections on account of *irrelevancy.*" They say that whatever *relates* to the point in issue, whether it come from a reliable or a worthless source, is *relevant*, and must be admitted. Such may be the strict technical meaning of the term, but surely it *admits* of a popular use more in harmony with the general intent of this statute. It is common for one of two persons discussing their own affairs, to tell the other that what another person may have said about the affair, is " neither here nor there," is *out of place*, is *irrelevant.* That which is unworthy of consideration, may well be called immaterial or irrelevant, but that all mere hearsay is unworthy, the common law emphatically declares, and this statute certainly does not declare to the contrary as a general principle. I do not, therefore, give the force that my colleagues do, to this one word which admits of a far less mischievous sense, and which, if far less flexible, would be overborne, I think, by the abundant evidence of a different and much more rea-

Ector vs. Welsh, and Ector, guard'n.

sonable general intent.   It is a case, I think, where the letter
ought to yield to the manifest spirit.   *Qui hæret in litera,
hæret in cortice.*

[2.] It is undoubtedly good abstract law, as charged by the
Court, that the wife's interest in an estate is not subject to
her husband's debts, if he dies without ever having reduced
it into his possession, leaving her surviving him.   The only
doubt is whether the evidence authorized such a charge.
The evidence is all concurrent, that Welsh did have *a certain*
possession of his wife's interest, but whether that was *his*
possession for himself, or a possession for his wife's daughter,
depends, we think, upon the question whether or not the
joint deed of gift of himself and wife, conveying that interest
to his step-daughter before it had come into his occupancy;
was a valid deed against Welsh's creditors, who were such
when the deed of gift was made.   It was said in argument
that it was valid (though voluntary) as a settlement of the
wife's equity; that it is such as a Court of Equity will sanc-
tion though it has not ordered it.   The question with me,
and I believe with all of us, is whether a Court of Equi-
ty will order or sanction any settlement which excludes from
its benefits both the wife and the fruit of the marriage.   Is
not the husband himself interested in having a support se-
cured to his wife, and would a Court of Equity order him
to make any settlement which excludes her?   If not, then
will it *sanction* a settlement which it would never have di-
rected?   If the settlement was not a good one, then the pos-
session which he afterwards got was his own and not his
step-daughter's.   We are not satisfied as to this charge, and
decide nothing as to it.   We only throw out the points in it
on which we would like to see authority, if the case should
ever come before us again.

[3.] We think there was no error in charging that the sin-
gle fact of the donor's retaining possession of the thing given,
is sufficiently explained by showing that the donee lives with

him and is a minor, being his child, or standing in the place of his child. This we think is good law; but I must remark that it is not applicable to this case, unless the deed of gift would be valid without the difficulty from failure of change of possession from donor to donee; that is to say, unless the deed would be valid if the possession under it had gone directly into the donee, instead of into the donor for her.

[4.] We do not think that admissions by parties are to be regarded as an inferior kind of evidence; for, on the contrary, when satisfactorily proven, they constitute a ground of belief on which the mind justly reposes with strong confidence.

But, it is true, that the proof of the fact that admissions were made, and of the terms in which they were made, ought to be cautiously scanned. We do not all of us think there was distinct error in this charge as given, but for myself I do think so. I do not perceive what reason there is for pronouncing a sentence of degradation on this sort of evidence.

Judgment reversed.